# United States Court of Appeals for the Federal Circuit

---

**BETTCHER INDUSTRIES, INC.,**
*Plaintiff-Cross Appellant,*

v.

**BUNZL USA, INC.,**
*Defendant,*

**and**

**BUNZL PROCESSOR DISTRIBUTION, LLC,**
*Defendant-Appellant.*

---

2011-1038, -1046

---

Appeals from the United States District Court for the Northern District of Ohio in case no. 08-CV-2423, Judge Jack Zouhary.

---

Decided: October 3, 2011

---

THOMAS H. SHUNK, Baker & Hostetler LLP, of Cleveland, Ohio, argued for the plaintiff-cross appellant. With him on the brief was DAVID E. KITCHEN. Of counsel on the brief was GEORGE L. PINCHAK, Tarolli, Sundheim, Covell & Tummino, LLP, of Cleveland, Ohio.

ALAN H. NORMAN, Thompson Coburn LLP, of St. Louis, Missouri, argued for the appellant. With him on the brief were JASON M. SCHWENT, NICHOLAS J. LAMB and MICHAEL L. NEPPLE.

---

Before BRYSON, LINN, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LINN.
Dissenting opinion filed by *Circuit Judge* REYNA.

LINN, *Circuit Judge.*

Following the entry of judgment of non-infringement and no invalidity in a lawsuit brought against Bunzl Processor Distribution, LLC ("Bunzl") and Bunzl USA, Inc. (no longer a party) by Bettcher Industries, Inc. ("Bettcher") in the Northern District of Ohio for infringement of U.S. Patent No. 7,000,325 ("'325 patent"), Bunzl appeals from a denial of its motion for entry of judgment as a matter of law of invalidity or for a new trial on invalidity. Bettcher cross-appeals from the district court's refusal to order a new trial on infringement following the jury's verdict of non-infringement. For the reasons discussed below, we affirm in part, vacate in part, and remand.

## I. BACKGROUND

### A. Bettcher's '325 Patent

Bettcher's asserted '325 patent, entitled "Low Friction Rotary Knife," is directed to a power operated knife used principally in the meat packing and other commercial food processing industries and containing a handle on which is supported an annular rotating blade assembly. The handle includes a motor and a gear train, and the

rotating blade assembly contains an annular blade support housing attached to the handle and an annular blade rotatably carried by the housing. '325 patent col.1 ll.18-28.

Figures 1 and 2 of the '325 patent generally depict the power operated rotary knife (modified for clarity):



In use, an operator holds the handle and swipes the far end of the annular blade across a piece of meat, for example, to shave off an unwanted layer that moves up through the open center of the annulus and falls off.

The claims of the patent are directed to the knife blade itself. The claimed blade includes an annular bearing race recessed into a side wall of the blade and dimensioned to receive a protruding annular bearing structure of the blade support housing to maintain the blade in spinning contact with the knife. Figure 9 is a cross sectional depiction of the rotary knife blade mounted within the housing and shows the interaction between the recessed bearing race and the protruding bearing structure:



Fig.9

The '325 patent explains:

The bearing race 66 receives the bearing structure
47 so that the blade body 50 is secured to the
blade support structure by the bearing race and
bearing structure engagement along bearing loca-
tions that are spaced axially apart and firmly
support the blade against axial and radial shifting
during use. The bearing race 66 extends into the
wall 62 and is spaced axially from the blade sec-
tion 52 in that the surface 64 extends between the
bearing structure 47 and the blade section 52.

The bearing race 66 comprises a [sic] first and
second bearing surfaces 70, 72 that converge pro-
ceeding toward each other. In the illustrated
knife the race extends radially inwardly into the
wall 62 . . . . In the illustrated blade, the surfaces
70, 72 are frustoconical. As shown, they are
joined at their radially inner ends by a short axi-
ally extending annular surface 74 that serves to
minimize the race depth and does not engage the
bearing structure 47.

*Id.* col.5 ll.10-30.

Claim 1 of the '325 patent reads:

> 1. A rotary knife blade comprising:
> a rotatable annular body defining first and second axial ends, said body disposed about a central axis; and,
> an annular blade section rotatable with the annular body and projecting axially from the first axial end of said body;
> said body comprised of a wall defining a radially outer surface disposed between said first and second axial ends, and *an annular bearing race in said surface and extending radially into said wall*, said bearing race spaced axially from said blade section and comprising a first surface that converges proceeding away from said second axial end, and a second surface that converges proceeding toward said first surface, *said first and second surfaces defining first and second bearing faces spaced axially apart, wherein both of said bearing faces are frusto-conical.*

*Id*. col.9 ll.15-31 (emphases added). Claim 1 is exemplary of the claims at issue, with the following variations in relevant claim terms: Claims 6 and 7 replace "bearing race" with "bearing race opening" and claim 8 replaces "bearing race" with "groove" and "bearing face" with "bearing surface." *Id*. col.9 l.42 - col.10 l.37.

## B. Proceedings at the District Court

### 1. Bunzl's Invalidity Allegations

#### i. Pre-1998 Bettcher Blades

Bunzl asserted at trial that the '325 patent was invalid as anticipated by prior art Bettcher blades that, while they contained a different bearing race configuration, included chamfered corners argued as inherently capable of being used as a bearing race. Bettcher countered that the pre-1998 blades did not anticipate the claims of the '325 patent because they lacked the frustoconical bearing faces or surfaces required by each claim of the '325 patent. The following image provides a cross sectional view of the pre-1998 Bettcher blade:



Cross-Appellant Br. 21. As the image reveals, the pre-1998 blade includes two chamfers at the intersections of the bearing race walls and the outer surface of the blade body. According to Bunzl, these chamfers inherently

satisfy the frustoconical bearing face limitations because of their shape and their capability "of being in rolling or sliding contact with a support member." Appellant Br. 39.

Bunzl's position was prefaced by statements made during claim construction. In its claim construction brief, Bunzl asserted that "bearing surface" should be construed to mean "slideable support surface." Cross-Appellant Br. 4, J.A. 307T. Bunzl also asserted that "bearing race" should be construed to mean "channel *configured* to slideably support a rotary knife blade." J.A. 307S (emphasis added). As to both "bearing surface" and "bearing race," Bunzl did not provide argument in its brief except to say that "[t]his term is not commonly used by lay persons and jurors" and that failing to construe each term at all would be improper. J.A. 307S, 307T. Bettcher contended that these terms did not require separate construction.

At the *Markman* hearing in June 2009, the district court stated that the "bearing face," "bearing surface," and "bearing race" issues were inadequately presented in the briefs. Later, in its claim construction order in September 2009, the district court stated that "[d]uring [the *Markman*] hearing, the dispute between the parties was narrowed to one disputed definition: namely, 'frustoconical' [and b]oth sides agree that 'only disputed claim terms need to be construed by the Court.'" Markman Order at 1, *Bettcher Indus., Inc. v. Bunzl USA, Inc. et al.*, No. 3:08 CV 2423 (N.D. Ohio Sept. 9, 2009), ECF No. 115. In March 2010, the court issued an Amended Case Schedule which extended through trial, and made no mention of any claim construction proceedings. This new schedule was based on a request jointly submitted by the parties.

In June 2010, a year after the *Markman* hearing, Bunzl requested a jury instruction that "bearing surface" and "bearing face" should be understood to mean "surface

capable of being in rolling or sliding contact with a support member." J.A. 3285. Bunzl also requested a jury instruction that "annular bearing race," "annular bearing race opening," and "groove" all mean "groove." *Id.* Bunzl's requested constructions included no argument. Rather than adopt Bunzl's proposals, the court told the jury to "give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history." Trial Tr. 1429:2-4. The court commented that "[t]he only claim construction provided to the Court at the Markman hearing was frustoconical. There was no request for additional definitions, and I believe that request for additional definitions on the eve of or during trial is too late." *Id.* 1629:3-7.

The district court also presented the jury with the following instruction:

> To anticipate a claim of the '325 patent, the pre-1998 blade must contain every limitation of that particular claim. Anticipation requires that there is no difference between claims of the '325 patent and the pre-1998 Bettcher blade, as viewed by a person of ordinary skill in the art.

Trial Tr. 1434:17-23. Bunzl objected to the second sentence of the instruction because "the only prior art at issue with respect to the anticipation argument are prior art blades that were on sale by Bettcher more than a year before the effective filing date of the '325 patent," and because the statement was "not consistent with *In re Schreiber*." *Id.* 1624:14-19.

At trial, Bunzl's expert, Dr. King, testified that he had created a mockup rig with a rotating blade configured like the pre-1998 blades and using only the chamfers as bearing surfaces. Bettcher countered with evidence that a person of skill in the art would not consider the chamfers

to be bearing faces or part of a bearing race, and contested the chamfers' ability to function as such based on the testimony of its expert.

Bunzl moved for judgment as a matter of law of invalidity after the close of evidence, arguing that each limitation was admittedly met and that the claims were inherently anticipated. That motion was denied. After the verdict, Bunzl renewed its motion for judgment as a matter of law and brought its alternative motion for a new trial on invalidity. Bunzl argued that "Bettcher's contention that a person of ordinary skill in the art would not have recognized that the chamfered surfaces of the pre-1998 blades could be used as bearing surfaces is legally irrelevant" and that satisfaction of the bearing face limitation required only that "the chamfered surfaces are frustoconically shaped." J.A. 3338. The district court denied Bunzl's motion, commenting that "Bunzl waived any argument as to other terms not addressed in this Court's Markman Order . . . [and that] evidence at trial was sufficient to support the jury's verdict of patent validity." Order at 1-2, *Bettcher*, No. 3:08 CV 2423 (N.D. Ohio Sept. 16, 2010), ECF No. 261 ("Sept. 16 Order").

## ii. Section 315 Estoppel

After Bettcher filed suit, and while proceedings were pending before the district court, Bunzl requested inter-partes reexamination of the '325 patent in the United States Patent and Trademark Office ("Patent Office"). In due course, the reexamination was granted and the examiner ultimately declined to adopt the grounds of rejection proposed by Bunzl and issued a Right of Appeal Notice. Bunzl appealed to the Board of Patent Appeals and Interferences ("Board"). At the time of the filing of the appeal to this court, the reexamination was pending before the Board, which has since affirmed the examiner's

conclusions affirming the validity of all claims subject to reexamination. *Bunzl Processor Distrib. LLC v. Patent of Bettcher Indus., Inc.*, Appeal 2011-007091 (B.P.A.I. July 28, 2011).

When the examiner issued the Right of Appeal Notice, Bettcher requested that the district court exclude certain of Bunzl's invalidity references under 35 U.S.C. § 315(c) on the ground that the examiner had already determined that they did not invalidate the claims of the '325 patent and therefore, according to Bettcher, Bunzl was estopped from asserting these references in district court. According to Bettcher, the § 315 estoppel took effect as soon as the examiner finished the reexamination and the Right of Appeal Notice was sent to the patentee. The district court agreed that the examiner had "issued a 'final determination' in the re-examination proceedings," and granted Bettcher's request to exclude the references. Bunzl included the exclusion of these references as a separate basis for its new trial motion. The district court denied Bunzl's motion, noting that "this issue is one of first impression." Sept. 16 Order at 1.

## 2. Bettcher's Infringement Allegations

Bettcher accused Bunzl of infringement based on Bunzl's manufacture and sale of rotary knife blades marketed as replacement blades for use in rotary knives manufactured and sold by Bettcher. Bunzl's blades lack the frustoconical bearing faces described in the '325 patent and recited in the '325 patent claims and, instead, contain a completely rounded bearing race. According to Bettcher, once Bunzl's blades are installed and put into use, their round bearing faces wear until they become frustoconical. Therefore, Bettcher accused Bunzl of indirect infringement based on this "wear" theory. The

following image depicts the accused Bunzl blade, installed in a support housing:



Cross-Appellant Br. 13.

At trial, Bunzl called as its witness Mark Stallion ("Stallion"), a patent lawyer, from whom Bunzl allegedly received an unwritten opinion in 2007 counseling that Bettcher was unlikely to win an infringement suit based on its "wear" theory. Bunzl offered Stallion's testimony to prove Bunzl's state of mind for inducement and willfulness. Bettcher moved to exclude Stallion's testimony, but the district court allowed Stallion to testify as to his 2007 opinion. At trial, Stallion testified that he had informed Bunzl that it appeared Bettcher was asserting a theory of indirect infringement and had conceded that the Bunzl blades did not infringe at the time of sale. Stallion testified that he informed Bunzl that Bettcher's theory of indirect infringement required either an absence of substantial non-infringing use (contributory infringement) or intent to cause the infringing acts (inducement) and that, in his estimation, Bunzl lacked both. Stallion also testified that he informed Bunzl that as a matter of fact it was unlikely that the Bunzl bearing races actually wore to the claimed frustoconical shape when installed and used.

Counsel for Bettcher did not object to the above quoted statements during Stallion's direct examination except to request a side-bar, after which the judge emphasized to the jury that "[y]our role in this case is to determine whether Mr. Stallion gave competent advice and whether Bunzl could rely on it . . . . [O]nly the law as given to you by me should be considered by you in deciding the issues in this case." Trial Tr. 1080-1081.

At closing argument, counsel for Bunzl stated with regard to Stallion's testimony that: "We called Mr. Stallion, who you heard is a patent lawyer. Patent lawyers talk about what patent lawyers talk about . . . . The only patent lawyer that testified in this case is Mr. Stallion, and that's what he told you . . . . Mr. Stallion put it in legal for you . . . . He said there's no way these immediately can wear." *Id.* 1470-1475. Counsel for Bettcher did not object to counsel for Bunzl's closing remarks regarding Stallion's testimony.

After the close of evidence, the district court instructed the jury: "When considering whether Bunzl knew or should have known that the induced actions would constitute infringement . . . you may consider . . . whether or not Bunzl obtained the advice of a competent lawyer . . . [but t]he applicable law is the law that I have given you, which may or may not be the law relied on by Bunzl's attorney." *Id.* 1431:21 - 1432:11.

The jury returned a verdict of non-infringement. Bettcher moved for a new trial, arguing prejudice based on Stallion's testimony and Bunzl's closing argument. In denying the motion, the court stated that "[t]he testimony was limited and appropriate, and presented with a cautionary instruction . . . [and that] Bunzl's closing argument, while perhaps stretching the reach of Stallion's testimony, does not warrant reversal, as the jury was

further cautioned, several times, that comments by counsel were not evidence." Sept. 16 Order at 2.

## C. The Present Appeal

Bunzl timely appealed the denial of judgment as a matter of law or a new trial on the issue of invalidity and Bettcher timely cross-appealed the denial of its motion for a new trial on the issue of infringement. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

## A. Standard of Review

In reviewing a district court's disposition of a motion for judgment as a matter of law or a new trial motion, this court applies the law of the regional circuit where the district court sits. *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1277 (Fed. Cir. 2011). The Sixth Circuit reviews denial of a motion for judgment as a matter of law de novo. *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1379 (Fed. Cir. 2009). In the Sixth Circuit, judgment as a matter of law is appropriate "only if, in viewing the evidence in the light most favorable to the nonmoving party, reasonable minds could come to but one conclusion, in favor of the moving party." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (quotation omitted). "In reviewing the district court's decision, [the court] may not weigh the evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (quotation omitted).

The Sixth Circuit reviews denial of a motion for new trial for abuse of discretion. *Gemtron*, 572 F.3d at 1379.

Under Sixth Circuit law, "there is no abuse of discretion unless the court has a definite and firm conviction that the trial court committed a clear error of judgment." *Mich. First Credit Union v. Cumis Ins. Soc., Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (quotation omitted). "[I]f the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." *Id*. at 246 (quotation omitted).

This court reviews a district court's decision whether to exclude evidence under the law of the regional circuit. *Siemens*, 637 F.3d at 1284. The Sixth Circuit reviews a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010). A district court abuses its discretion in this regard when it bases its decision on errors of law or clearly erroneous factual determinations. *Id.*

> [E]ven if the lower court's decision amounts to an abuse of discretion, it will not be disturbed on appeal if it did not result in a substantial injustice, as no error in the admission or exclusion of evidence is ground for reversal or granting a new trial unless refusal to take such action appears to the court to be inconsistent with substantial justice.

*Zamlen v. City of Cleveland*, 906 F.2d 209, 216 (6th Cir. 1990) (quotation omitted).

The legal sufficiency of jury instructions on an issue of patent law is a question of Federal Circuit law which this court reviews de novo, ordering a new trial on that basis only when errors in the instructions as a whole clearly misled the jury. *Siemens*, 637 F.3d at 1278. "In reviewing jury instructions, the full trial record and the jury instructions in their entirety must be examined because instructions take on meaning from the context of what

happened at trial, including how the parties tried the case and their arguments to the jury." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1331 (Fed. Cir. 2010). Thus, a jury verdict generally will not be set aside, on motion for judgment as a matter of law or new trial, based on erroneous instructions unless the movant can establish that the instructions were legally erroneous and that the errors had a prejudicial effect. *Id.* "More specifically, a party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311-12 (Fed. Cir. 2005) (quotation omitted).

Statutory interpretation is a question of law that this court reviews de novo. *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1361 (Fed. Cir. 2010).

## B. Anticipation Based on Bettcher Prior Art

Bunzl argues that the district court erred by refusing to enter judgment of invalidity as a matter of law, and, alternatively, by refusing to grant a new trial on the issue of anticipation by the pre-1998 Bettcher blades. We disagree and address each argument in turn.

### 1. Judgment as a Matter of Law

Bunzl argues that the chamfers are inherently capable of serving as bearing faces, that no evidence contradicts this basic capability, and that no other claim limitation is in dispute as to the pre-1998 Bettcher blades. According to Bunzl, it is irrelevant whether anyone ever actually used the chamfers as bearing faces of a bearing

race, just as it is irrelevant whether a person of skill in the art ever would have appreciated this alleged capability. According to Bunzl, the only thing the claim requires of the "bearing face" is that it be capable of bearing, without any restrictions on quality or duration, any actual useful functionality, or any structural properties that would have been recognizable to a person of ordinary skill in the art. Bunzl asserts that its expert's mockup left no factual issue for the jury to decide and, by definition, no evidence sufficient to support the jury's verdict.

Bettcher counters that the engineering drawings, which were the sole evidence of the actual pre-1998 Bettcher blades, made it clear that the feature Bunzl relies upon is a set of chamfers whose purpose was "to provide clearance and avoid contact with a mating part – the precise opposite of Bunzl's theory that the chamfers were inherently bearing surfaces." Cross-Appellant Br. 29. According to Bettcher, all witnesses agreed that the actual engineering specification established that the disputed features were chamfers. Moreover, the witnesses disagreed about whether the chamfers would be able to serve as bearing faces. Bettcher argues that inherent anticipation requires that the chamfers always necessarily function as bearing faces.

In each asserted claim of the '325 patent, the bearing faces must be part of the bearing race or groove. Whether or not the chamfers of the pre-1998 blades could be capable of serving as bearing faces in some hypothetical circumstances, the jury had more than sufficient evidence to support a finding that the chamfers found in the pre-1998 Bettcher blade were not part of the bearing race within the meaning of that term in the '325 patent.

While Bunzl struggles to characterize this as a case of "inherency," it is nothing of the sort. Inherency can be established when "prior art necessarily functions in

accordance with, or includes, the claimed limitations." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981). Here, Bunzl attempts to characterize one structure (chamfers) as a completely different structure (a bearing race) based on a hypothetical configuration of surrounding structures disclosed nowhere in the prior art (expressly or inherently) and suggested by nothing in the record. A "bearing face," and the bearing race of which it must be a part, may have both structural and functional limitations, but the functional limitation requires more than the ability to bear for a short period of time at an unusually slow speed. Bunzl failed to demonstrate that the pre-1998 blades were capable of anything more, and the jury was therefore fully entitled to reject Bunzl's argument in light of the evidence at trial. Bunzl's reliance on *Schreiber* to the contrary is misplaced.

Ultimately, the prior art at issue in this case shows what it shows, and the jury was free to draw whatever conclusions manifested themselves from the evidence presented. The evidence showed that the chamfers were designed to remove the sharp corners and not to interact with each other to collectively perform any function, let alone the function of a bearing race. And the undisputed fact is that no one ever used the chamfers to bear anything prior to the critical date of the '325 patent. The speculative notion that by happenstance the chamfers might, under hypothetical circumstances, be capable of operating as a bearing race is an insufficient basis to mandate overturning the jury's verdict. For these reasons, Bunzl was not entitled to judgment as a matter of law.

2. New Trial on Anticipation by the Bettcher Blades

Bunzl argues in the alternative that it is entitled to a new trial on the issue of invalidity because of the district court's refusal to adopt its proposed construction of "bearing face" and "bearing surface" and because the district court instructed the jury that anticipation requires that there be no difference between the prior art and the claimed invention as viewed by one of ordinary skill in the art. Again, we disagree, and address each argument in turn.

i. Claim Construction

According to Bunzl, it asked the district court to construe "bearing face" and "bearing surface" to mean "surface capable of being in rolling or sliding contact with a support member." Bunzl argues that if "the jury had been so instructed, it *might* have understood that a surface constitutes a bearing surface if it has certain capabilities, regardless of whether the surface had ever been used or intended to be used to perform such capabilities." Appellant Br. 39 (emphasis added). Bunzl argues that not construing these terms violated *02 Micro International Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351 (Fed. Cir. 2008). According to Bunzl, "[i]f the term . . . had been properly construed . . . then it would have been undisputed that the chamfered surfaces constitute bearing surfaces and Bettcher's pre-1998 blades are anticipatory prior art." Appellant Br. 41. Bettcher counters that Bunzl abandoned this issue and that substantial evidence supported the verdict with or without the proposed constructions.

Bunzl's argument lacks merit. As described above, Bunzl had ample opportunity to seek construction of the "bearing face" limitation. Here, the parties agreed to a

schedule of disclosures. The district court issued a *Markman* order premised on the express belief that there were no other claim construction disputes. Bunzl said nothing. And then, a year after the *Markman* hearing, after submitting a new joint schedule that contained nothing about claim construction, Bunzl asked for a *new* construction. Under the circumstances of this case, the district court did not abuse its discretion in holding that Bunzl could not add new claim construction theories on the eve of trial. Moreover, because the jury would have been free to determine that the chamfers were simply not *the* parts of the *bearing race* that had the so-called "capability," as discussed above, Bunzl's proposed construction would have changed nothing. The court did not err in declining to construe these terms.

### ii. Jury Instructions

As stated above, the district court instructed the jury that:

> To anticipate a claim of the '325 patent, the pre-1998 blade must contain every limitation of that particular claim. Anticipation requires that there is no difference between claims of the '325 patent and the pre-1998 Bettcher blade, as viewed by a person of ordinary skill in the art.

Trial Tr. 1434:17-23. In that instruction, Bunzl objects to the phrases "as viewed by a person of ordinary skill in the art" and "no difference." This court addresses each in turn.

### a. "as viewed by a person of ordinary skill in the art"

Bunzl argues that the district court's instruction to the jury that prior art must be understood "as viewed by

one of ordinary skill in the art" is contrary to this court's inherency precedent and potentially misled the jury by excluding the possibility of an unappreciated inherent feature. Bunzl relies on *In re Cruciferous Sprout Litigation*, 301 F.3d at 1349 ("Inherency is not necessarily coterminous with knowledge of those of ordinary skill in the art . . . [who] may not recognize the inherent characteristics or functioning of the prior art." (quotation omitted)), *In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997), and other cases, to support its view. According to Bunzl, the perspective of a person of ordinary skill in the art is irrelevant to inherency. Bunzl states that the jury instruction meant that "the jury could not have found anticipation of the claims unless it was also persuaded that before the critical date . . . a person of ordinary skill in the art *had understood* that the pre-1998 blades could have so functioned." Appellant Br. 37 (emphasis added).

Bettcher counters by citing *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) *overruled in part on other grounds by Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009) (anticipation requires there to be "no difference between the claimed invention and the reference disclosure *as viewed by a person of ordinary skill in the art*." (emphasis added)), and other cases, to support the jury instruction. Bettcher also argues that Bunzl's own jury instruction included the same language, and that Bunzl thus effectively admitted that the instruction was correct.

As this court has previously explained:

[a] jury verdict will be set aside, based on erroneous jury instructions, if the party seeking to set aside the verdict can establish that those instructions were legally erroneous, and that the errors had prejudicial effect. More specifically, a party seeking to alter a judgment based on erroneous

jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error. Prejudicial legal error exists when it appears to the court [that the error is] inconsistent with substantial justice. However, when the error in a jury instruction could not have changed the result, the erroneous instruction is harmless. . . . [A] reversal . . . is not available to an appellant who merely establishes error in instructions . . . . Where the procedural error was 'harmless,' *i.e.*, where the evidence in support of the verdict was so overwhelming that the same verdict would necessarily be reached absent the error, or the error was cured by an instruction, a new trial would be mere waste and affirmance of the judgment is required.

*NTP*, 418 F.3d at 1311-12 (quotations omitted).

Bunzl has failed to establish that the jury instruction was wrong or that it suffered any prejudice. As noted above in connection with Bunzl's bid for judgment as a matter of law, the evidence in this case was such that a reasonable jury could have found that the chamfers in the Bettcher blades were not bearing faces of a bearing race as viewed from *any* perspective, be that a lay person's, an expert's, or an ordinarily skilled artisan's. Bunzl's only argument that the jury instruction was even remotely problematic, to say nothing of erroneous, rests entirely on the premise that this is a case of inherent anticipation. For the reasons already explained above, it is not.

Bunzl has not shown that the language from *Scripps* caused any confusion when applied by the jury to the facts of this case. Therefore, Bunzl has not satisfied the four

part test elaborated in *NTP*, 418 F.3d at 1311-12, to disturb a judgment based on an erroneous jury instruction. Moreover, Bunzl has not mustered any evidence sufficient to overcome the substantial deference due a trial court in ruling on motions for new trial. "[I]f the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." *Mich. First Credit Union*, 641 F.3d at 246 (quotation omitted). The district court did not abuse its discretion in denying Bunzl's motion on this ground.

### b. "no difference"

Bunzl also argues that the district court erred by instructing the jury that anticipation required that there be "no difference" between the prior art and the claimed invention. Bunzl argues that "the jury instruction may have mislead [sic] the jury into believing that the presence of additional features in the pre-1998 Bettcher blade would preclude a finding of anticipation." Appellant Reply Br. 16.

Bunzl's concern with the "no difference" language is apparently based on the fear that the jury might have mistakenly thought that some extraneous feature of the prior art negated anticipation. No such extraneous feature appears to have been at issue in this case. So no showing of prejudice is possible. Bunzl's remaining arguments regarding the court's jury instructions have been considered and are not persuasive.

We hold that Bunzl is not entitled to a new trial regarding invalidity based on the pre-1998 Bettcher blades.

## C. Estoppel Under 35 U.S.C. § 315

Bunzl contends that the district court wrongly interpreted 35 U.S.C. § 315 in holding that its estoppel provision applied at the conclusion of examination when the examiner issued the Right of Appeal Notice. Bunzl seeks a new trial on obviousness on this basis. As discussed below, this court agrees with Bunzl that the estoppel provision of § 315 is triggered not when examination is completed but only after all appeal rights have been exhausted.

Inter-partes reexamination proceedings are codified at 35 U.S.C. §§ 311-318. Section 315, entitled "Appeal," provides:

(a) Patent owner. – The patent owner involved in an inter partes reexamination proceeding under this chapter –

(1) may appeal under the provisions of section 134 [*i.e.*, to the Board] and may appeal under the provisions of sections 141 through 144 [*i.e.*, to the Federal Circuit], with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent; and

(2) may be a party to any appeal taken by a third-party requester under subsection (b).

(b) Third-party requester. – A third-party requester—

(1) may appeal under the provisions of section 134, and may appeal under the provisions of sections 141 through 144, with respect to any final decision favorable to the patentability of any

original or proposed amended or new claim of the patent; and

(2) may, subject to subsection (c), be a party to any appeal taken by the patent owner under the provisions of section 134 or sections 141 through 144.

(c) A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings.

When the estoppel of § 315(c) attaches is a question of first impression.

### 1. The Parties' Arguments On Appeal

Bunzl argues on appeal that: (1) district court decisions support Bunzl's interpretation of the statute; (2) the concept of "finality" means that the controversy must be at an end; (3) § 316 defines finality as the exhaustion of all appeal rights; (4) § 315 distinguishes final decisions from final determinations; (5) § 312's definition of a determination on substantial new questions of patentability as "final and non-appealable" means that final determinations under § 315 must also be unappealable; (6) Bunzl's view is consistent with Congress's purpose in

creating inter-partes reexamination; (7) applying the estoppel as of the Right of Appeal Notice would render the statute internally inconsistent; and (8) the legislative history supports Bunzl.

Bettcher counters that: (1) related regulations prove that right of appeal notices are final determinations; (2) the "fact estoppel" provision of the 1999 act creating inter partes reexaminations and its legislative history support Bettcher; (3) § 317 demonstrates that Congress did not intend to condition estoppel on exhaustion of appeals; (4) minimizing "harassment," a purpose in the legislative history, is only served if estoppel attaches when the reexamination becomes appealable; (5) § 315 estoppel would be superfluous if it attached after appeals to this court because this court's decisions bind district courts; (6) Bunzl's reliance on district court cases and law dictionaries is unavailing; and (7) Bettcher's interpretation does not render the statute internally inconsistent.

The parties' arguments on appeal essentially require this court to decide the meaning of "finally determined" in § 315(c) in view of the language of the statute, the legislative framework, the related regulations, and the legislative history.

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Pennzoil-Quaker State Co. v. United States*, 511 F.3d 1365, 1373 (Fed. Cir. 2008) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory

scheme." *Davis v. Mich. Dep't. of Treasury*, 498 U.S. 803, 809 (1989). Section 315 does not expressly define "finally determined," but its content and context do.

### a. Section 315

The estoppel provision appears at the end of § 315, which provides appeal rights both from examiner and Board decisions. Specifically, § 315(a) provides that patent owners "may appeal under the provisions of section 134 [*i.e.* to the Board] and may appeal under the provisions of sections 141 through 144 [i.e. to the Federal Circuit]," as well as participate in any appeal brought by a third-party requester. And § 315(b) likewise provides that third-party requesters may appeal both to the Board and to the Federal Circuit, and may participate in appeals brought by patent owners. The estoppel provision of subsection (c) thus falls immediately following the establishment of both parties' rights of appeal, including appeal to this court.

The placement of the estoppel provision within the inter partes reexamination statute strongly suggests that the phrase "finally determined" refers to the stage of the proceedings when the events contemplated by subsections (a) and (b) have run their course. And because subsections (a) and (b) both state that the parties may appeal decisions both to the Board and to this court, this implies that estoppel requires exhaustion of all appeal rights, including appeals to this court.

Bunzl argues that because subsections (a) and (b) refer to "final decisions," whereas subsection (c) refers to "final determinations," therefore the appealable "decisions" of subsections (a) and (b) do not, in and of themselves, amount to "final determinations." We agree. While the difference in terminology is not necessarily

compelling, it is nonetheless supportive of this court's interpretation of § 315.

## b. Section 316

Section 316, entitled "Certificate of patentability, unpatentability, and claim cancellation," provides in relevant part:

> (a) . . . In an inter partes reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable.

According to Bunzl, § 316 defines finality as the exhaustion of all appeal rights. This court agrees with Bunzl that § 316 defines a determination of patentability to occur only after all appeals have terminated. Issuance of the reexamination certificate only happens "when the time for appeal has expired or any appeal proceeding has terminated." § 316. This provision makes no distinction between appeals to the Board and to this court. And reexamination certificates are not issued piecemeal, at intermediate stages of the reexamination proceeding. This is reflected in the Manual of Patent Examining Procedure ("M.P.E.P.") § 2687 (emphases in original):

> Upon conclusion of the *inter partes* reexamination proceeding, the examiner must complete a Notice of Intent to Issue *Inter Partes* Reexamination Certificate (NIRC) . . . .

The following are the only instances when issuance of NIRC action would be proper in an *inter partes* reexamination proceeding:

(A) There is **no** timely response by the patent owner to an Office action requiring a response. . . .

(B) After a Right of Appeal Notice (RAN) where no party to the reexamination timely files a notice of appeal.

(C) After filing a notice of appeal, where all parties who filed a notice of appeal or notice of cross appeal fail to timely file an appellant brief (or fail to timely complete the brief, where the appellant brief is noted by the examiner as being incomplete).

(D) After a final decision by the Board of Patent Appeals and Interferences (Board), where there is no further timely appeal to the Court of Appeals for the Federal Circuit nor is there a timely request for rehearing by the Board.

(E) After the Federal Court appeal process has been completed and the case is returned to the examiner.

### c. Section 317

Section 317, entitled "[i]nter partes reexamination prohibited," limits subsequent reexaminations:

(a) Order for reexamination.–Notwithstanding any provision of this chapter, once an order for inter partes reexamination of a patent has been issued under section 313, neither the third-party

requester nor its privies, may file a subsequent request for inter partes reexamination of the patent until an inter partes reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) Final decision.–Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit or if a final decision in an inter partes reexamination proceeding instituted by a third-party requester is favorable to the patentability of any original or proposed amended or new claim of the patent, then neither that party nor its privies may thereafter request an inter partes reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action or inter partes reexamination proceeding, and any inter partes reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter.  This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the patent and Trademark Office at the time of the inter partes reexamination proceedings.

35 U.S.C. § 317.  Section 317 includes two provisions. Subsection (a) is a complete bar on new reexaminations until the reexamination certificate is issued in the pending reexamination.  Subsection (b) attaches only after there has been a final resolution, either in federal court or in the pending reexamination.  Once it does attach, sub-

section (b) prevents the third-party requester from "request[ing] an inter partes reexamination . . . on the basis of issues which [it] raised or could have raised in [federal court or the prior reexamination]." Because subsection (b) prevents further reexamination proceedings once parallel federal court proceedings have reached their resolution, it serves a similar purpose to the § 315 estoppel.

The parallel structure of subsections (a) and (b) suggests that, while subsection (a) applies during the pendency of reexamination proceedings, subsection (b) applies only when reexamination and all appeals have terminated. The relevant House and Senate records confirm that § 317(b) applies "after any appeals." 145 Cong. Rec. 29276, 29973 (1999). And the Patent Office has interpreted § 317 consistent with this legislative history in M.P.E.P. § 2686.04 (emphases in original):

> While Congress desired that the creation of an *inter partes* reexamination option would lead to a reduction in expensive patent litigation, it nonetheless also provided in the statute that a court validity challenge and *inter partes* reexamination of a patent may occur simultaneously; but once one proceeding finally ends in a manner adverse to a third party, then the issues raised (or that could have been raised) with respect to the validity of a claim in that proceeding would have estoppel effect on the same issues in the other proceeding.
>
> . . .
>
> The 35 U.S.C. 317(b) estoppel applies only in a situation where a final decision adverse to the requester has already been issued. If there remains any time for an appeal, or a request for reconsideration, from a court (e.g., District Court or Fed-

eral Circuit) decision, or such action has already been taken, then the decision is not final, and the estoppel does not attach.

While we believe that § 317(b) is clear, even if it were ambiguous, the Patent Office's interpretation that § 317(b) does not apply "[i]f there remains any time for an appeal" would be entitled to deference. *See Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1336 (Fed. Cir. 2008) (holding that the "Patent Office had the authority under 35 U.S.C. § 2 to interpret section [of the act creating interpartes reexamination] because that interpretation both governs the conduct of proceedings in the Patent Office, not matters of substantive patent law, and is a prospective clarification of ambiguous statutory language."). Finally, we note that while this court agrees with Bunzl's interpretation of § 315, we do not agree entirely with the reasoning presented by Bunzl. Specifically, we do not agree with Bunzl's arguments premised on internal inconsistency within § 317 or inconsistency between §§ 315 and 317. In our view, neither argument withstands critical scrutiny.

## d. Reexamination Proceedings

The framework of reexamination proceedings also suggests that estoppel attaches after all appeals are exhausted. During appeal, the Board can assert new grounds of rejection provided that the applicant has the opportunity to respond. *See* 37 C.F.R. § 41.50(b) ("A new ground of rejection pursuant to this paragraph *shall not be considered final for judicial review*." (emphasis added)). And the addition of new grounds even extends to proceedings before this court. *See In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009) ("[W]e may . . . where appropriate, affirm the agency on grounds other than those relied upon in rendering its decision, when upholding the agency's

decision does not depend upon making a determination of fact not previously made by the agency." (quoting *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1568-69 (Fed. Cir. 1993))). Because the addition of new grounds of rejection on appeal entitles applicants to continue prosecution before the examiner, the structure of the reexamination proceeding suggests that reexamination is not final prior to the exhaustion of all appeal rights.

### e. Related Regulations

Bettcher argues that the regulations discussing the Right of Appeal Notice establish that the phrase "final determination" in § 315 refers to the Right of Appeal Notice. Bettcher relies on 37 C.F.R. § 1.953, which states in relevant part:

> The Right of Appeal Notice shall be a final action, which comprises a final rejection setting forth each ground of rejection and/or final decision favorable to patentability including each determination not to make a proposed rejection, an identification of the status of each claim, and the reasons for decisions favorable to patentability and/or the grounds of rejection for each claim.

Bettcher also relies on 37 C.F.R. § 41.61(a)(2), which states:

> Upon the issuance of a Right of Appeal Notice . . . the requester may appeal to the Board with respect to any final decision favorable to the patentability, including any final determination not to make a proposed rejection, of any original, proposed amended, or new claim of the patent . . . .

Bettcher's argument is essentially that because these regulations treat the Right of Appeal Notice as a "final action" and a "final decision," and because the Right of Appeal Notice incorporates a "final determination not to make a proposed rejection," therefore the phrase "finally determined" in § 315 must refer to a component of a Right of Appeal Notice. The quoted regulations in no way address the application of any estoppel. They certainly do not purport to interpret or define the statutory language of § 315. Bettcher's argument thus rings hollow and is not persuasive.

### f. Other Arguments

Bunzl also argues that the ordinary meaning of "finally determined" implies that the entirety of the controversy is at an end. As the discussion above makes clear, however, the phrase "finally determined" is not self-interpreting in the context of this statute.

Bettcher also argues that the purpose of "minimizing harassment" is not accomplished unless the estoppel attaches when the examiner issues a Right of Appeal Notice. Indeed, according to Bettcher, the estoppel would be redundant if it only applied after all appeals because decisions of this court are binding on district courts in any event. Bettcher's argument does not overcome the weight of evidence against Bettcher's proposed interpretation. As discussed above, Congress intended that reexaminations and civil patent litigation could occur in parallel, and it must be assumed that Congress was aware of any potential for "harassment" when it passed this provision. And Bettcher's view that the estoppel would be redundant if it did not apply immediately is wrong. This court's affirmance of an examiner's decision on reexamination does not preclude district courts from considering challenges to validity premised on the same prior art, in the absence of

an estoppel. The Supreme Court recently recognized as much, albeit in the context of examining the burden of proof applicable to a validity challenge. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011) ("[N]ew evidence supporting an invalidity defense may 'carry more weight' in an infringement action than evidence previously considered by the PTO.").

Finally, Bettcher looks for support from the legislative history of the uncodified "fact" estoppel of the 1999 act establishing inter-partes reexamination proceedings, published as a note to 35 U.S.C § 315. Pub. L. 106-113, Div. B. § 1000(a)(9) [Title IV, § 4607], Nov. 29, 1999, 113 Stat. 1536, 1501A-571. The legislative history of this provision states that the "estoppel arises after a final decision in the inter partes reexamination or a final decision in any appeal of such reexamination." 145 Cong. Rec. 29276, 29973 (1999). According to Bettcher, this statement distinguishes final decisions in reexaminations from final decisions on appeal, such that § 315(c) should be read to apply as soon as there is a final decision in a reexamination (*i.e.* a Right of Appeal Notice). This court is at a loss to understand how this argument helps Bettcher. Section 315 itself distinguishes final decisions from final determinations, as discussed above. But more importantly, the legislative history of the fact estoppel proves that it applies only after all appeal rights are exhausted. If anything, this suggests that the same is true of the estoppel of § 315, which applies to the ultimate issues whose determination is based on those same facts that are the subject of the "fact" estoppel. Bettcher's argument is not persuasive.

The parties' other arguments have been considered and are not persuasive. For the reasons discussed above, we hold that the estoppel provision of 35 U.S.C. § 315(c) applies only after all appeal rights are exhausted, including appeals to this court.

For these reasons, this court vacates the denial of Bunzl's motion for new trial on invalidity based on references excluded under the district court's interpretation of § 315(c) and remands so that the district court may determine in the first instance whether a new trial is warranted in the particular circumstances of this case.

## D. Infringement

In its cross-appeal, Bettcher seeks a new trial on the issue of infringement. Bettcher argues that Stallion's testimony was prejudicial because his 2007 opinion amounted to nothing more than unfounded speculation, because he testified as an expert on the ultimate legal and factual issues of infringement contravening the safeguards against incompetent expert testimony and invading the province of the court to explain the law, and because counsel for Bunzl wrongly characterized Stallion as an authority on legal and factual issues of infringement during closing argument. Bettcher also argues that this court needs to clarify the limits on the admissibility of opinion of counsel evidence in inducement cases and that the district court should not have instructed the jury to rely on such evidence.

Bunzl counters that the jury was properly instructed regarding the law of indirect infringement; that any error was harmless because Bettcher's "wear" theory of infringement was not legally cognizable or based on sufficient evidence; that Stallion's testimony was relevant to the accused infringer's state of mind for inducement and willful infringement; that Stallion did not testify as an expert; and that Bunzl's closing argument did not prejudice Bettcher in view of the court's clear instructions that only the court would explain the law to the jury.

To warrant disturbing the jury's verdict, Bettcher must show that the district court abused its discretion in

admitting Stallion's testimony, *Geisen*, 612 F.3d, at 495, and that, as a result of this abuse of discretion, Bettcher suffered substantial injustice. *Zamlen*, 906 F.2d, at 216. On these points, Bettcher's arguments fall short. Moreover, the fact that Bettcher did not contemporaneously object to the closing argument raises the threshold of prejudice it must establish to be entitled to a new trial. *See Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998) ("[F]ailure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated in order to get a new trial on appeal.").

This court concludes that a new trial is not warranted. The fact and general content of Stallion's opinion was relevant and admissible, at least with respect to Bunzl's state of mind and its bearing on indirect infringement. *See, DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1307 (Fed. Cir. 2006) (en banc in relevant part) (affirming denial of new trial on inducement where record evidence included opinion of counsel). And it is within the province of the jury to make credibility determinations regarding the competence of Stallion's advice, and the reasonableness of Bunzl's reliance thereon. *See, e.g., Litecubes, LLC v. N. Lights Prods., Inc.*, 523 F.3d 1353, 1374 (Fed. Cir. 2008) ("It is not the province of an appellate court to second guess the jury's credibility determinations or to reevaluate the weight to be given the evidence.").

Moreover, the infringement theory that Bettcher argues it was effectively precluded from presenting to the jury carries no weight. It is undisputed that the accused blades do not infringe as sold. The record on appeal does not support the view that Bunzl's blades ever start to infringe, let alone that they always, necessarily, or even usually wear to the allegedly infringing shape. Thus, Bettcher cannot establish either intent or the absence of a substantial non-infringing use for the accused blades. We

therefore agree with the district court that Bettcher is not entitled to a new trial on the issue of infringement.

### III. CONCLUSION

For the foregoing reasons, the denial of judgment as a matter of law or new trial on the issue of anticipation based on the pre-1998 Bettcher prior art blades is affirmed; the denial of a new trial on obviousness based on 35 U.S.C. § 315(c) is vacated; the denial of a new trial on the issue of infringement is affirmed; and the case is remanded for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

COSTS

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**BETTCHER INDUSTRIES, INC.,**
*Plaintiff-Cross Appellant,*

**v.**

**BUNZL USA, INC.,**
*Defendant,*

**AND**

**BUNZL PROCESSOR DISTRIBUTION, LLC,**
*Defendant-Appellant.*

---

2011-1038, -1046

---

Appeals from the United States District Court for the Northern District of Ohio in Case No. 08-CV-2423, Judge Jack Zouhary.

---

REYNA, *Circuit Judge*, dissenting.

I respectfully dissent. The plain meaning of the claim language of the '325 patent reads on Bettcher's own prior art products, which include all of the structural features required by the claims, and which possess the capability of satisfying the functional or intended use limitations. As the '325 patent is therefore invalid for anticipation as

a matter of law, I would reverse the district court and not reach the other issues presented in this appeal.

## I. BACKGROUND

The '325 patent is directed to a rotary knife blade as is commonly used for trimming or processing meat. Rotary knife blades are essentially ring-shaped blades mounted within a housing on a knife handle, where the housing includes a mechanism that spins the blade within the housing:



**Blade**

The blade includes an annular groove called a bearing race that enables one or more bearing beads within the housing to engage and support the blade, ensuring that there is no axial movement of the blade during rotation.



**Groove**



The particular embodiment of patented rotary knife blade disclosed in the specification is depicted with the following cross-sectional view:



Fig.9

The bearing race is generally indicated by reference numeral 66, and the first and second bearing surfaces are indicated by reference numerals 70 and 72. These bearing surfaces are characterized as being "frustoconical," which the district court defined as "the shape of a portion of an exterior surface of a cone."

Claim 1 of the '325 patent is representative, and recites that the bearing race comprises the following four elements:

(1) "a first surface that converges proceeding away from said second axial end"

(2) "a second surface that converges proceeding toward said first surface"

(3) "said first and second surfaces defining first and second bearing faces spaced axially apart"

(4) "wherein both of said bearing faces are frustoconical."

Importantly, aside from indicating the directions in which the first and second frustoconical bearing faces extend, the claims do not recite any particular length or size of those surfaces.

The prior art included blades previously made and sold by Bettcher, the so-called "pre-1998 blades." The parties do not dispute that the pre-1998 blades satisfied the claim elements of "a first surface that converges proceeding away from said second axial end," "a second surface that converges proceeding toward said first surface," those surfaces being "spaced axially apart," and that the two surfaces are "frustoconical." The only dis-

pute is whether the first surface and second surface of the pre-1998 blades "defin[e] first and second bearing faces," as recited by the claims. The following demonstrative juxtaposition of the patented blade and the pre-1998 blades is an accurate representation of the blades and the key surfaces at issue:



'325 Patented Blade          Pre-1998 Blades

The two converging surfaces in the pre-1998 blades were regarded as "chamfers." The chamfers were intended to provide clearance with mating parts, not to be used as bearing surfaces to engage the bearing beads in the knife housing. No commercial knife housing was shown to have existed at the time that would have used the chamfers as bearing surfaces. It was nevertheless possible for the chamfers to function as bearing surfaces. This possibility was evidenced by a mock-up housing created by Bunzl's expert and used at trial to rotate, for a few minutes, a prior art blade using the chamfers as bearing surfaces. Thus, Bunzl argues that the chamfers in the prior art blades satisfy the "bearing face" limitations because "[w]hether called chamfers, or any other name, the fact remains that the frustoconical surfaces

were capable of serving as bearing surfaces." Bunzl Reply Br. at 6.

The mock-up housing used stainless steel balls to engage the chamfers, and the blade was rotated using a standard variable speed power drill. This housing was admittedly not designed to simulate ordinary use conditions in an actual knife housing, but merely to determine whether it was possible to rotate a pre-1998 blade by its chamfers within a housing, which it succeeded in doing. Bettcher's expert conceded that the mock-up housing did in fact work to rotate the blade by the chamfers, but questioned its practical efficacy noting that "[h]ow long it lasts, whether it's functional, those are other issues." A2028:8-16. Bettcher's expert further testified that because the chamfers were so small, using them as bearing surfaces would cause them to dig into the mating parts within the housing. Thus, Bettcher argues that the chamfers cannot be deemed capable of serving as bearing surfaces for a rotary knife blade.

## II. ANTICIPATION

Under 35 U.S.C. § 102, anticipation exists when a single piece of prior art satisfies, either expressly or inherently, every limitation of the claimed invention. *King Pharms., Inc. v. Eon Labs, Inc.,* 616 F.3d 1267, 1274 (Fed. Cir. 2010). "Claim language defines claim scope," and so the claims must be properly construed for comparison to the allegedly anticipatory prior art. *Trintec Indus. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002).

There is no actual dispute here concerning whether the structural limitations of the claims are met by the pre-1998 blades—they are. The "first surface" and "sec-

ond surface" in the pre-1998 blades "converge" toward each other, they are "spaced axially apart," and they are "frustoconical" exactly as defined in the claims. Although the claims recite that the first and second surfaces "define[e] first and second bearing surfaces," this limitation does not further limit the structure of the claimed blade. The exact shapes, positions, contours, and configurations of the first and second surfaces are completely defined elsewhere in the claims. The claims merely mention that those first and second surfaces happen to "defin[e] first and second bearing faces." In essence this limitation does nothing more than give a name to the first and second surfaces: "bearing faces." Admittedly, the word "bearing" carries some meaning, but that meaning is not structural. At most, the "defining" limitation is an indication of an intended use or function of the first and second surfaces—that they be used to engage one or more bearing beads.

None of Bettcher's arguments directed to the efficacy of using the chamfers as bearing surfaces have any relation to the claim language at issue. The claims are directed to "a rotary knife blade" and cover the product only, not any particular use of it. Indeed, no characteristics of the knife housing in which the blades are intended to be used are reflected in the claims. There are no limitations regarding how fast the blade must be able to be spun, or for how long the blade must be able to sustain rotation at any particular speed. The claims also do not recite any particular width, contour, or positioning of the first and second surfaces such that they can engage with bearing beads of then-existing knife housings. They recite only that the converging surfaces be "spaced axially apart" and "frustoconical." No structural details as to the interior shape of the bearing race between two opposing bearing surfaces are required by the claims, and in effect

the '325 patent encompasses any blade that looks like this:



Absent further limitations directed at least to the length or size of the frustoconical surfaces, there is no patentable distinction between the claimed blade and the pre-1998 blades. The claim language plainly reads on the chamfers of the pre-1998 blades.

Turning to Bettcher's contention that the chamfers cannot be bearing surfaces because they were not recognized or used as such at the time, this court's decision in *In re Schreiber*, 128 F.3d 1473, 1477-78 (Fed. Cir. 1997) is both instructive and controlling. There, a claim directed to a popcorn dispensing spout was found anticipated by a prior art patent directed to a spout for dispensing oil. The claim at issue included both structural elements and functional elements. *Id.* at 1475. There was no dispute that the structural limitations of the claim were all met by the prior art oil spout. *Id.* at 1477 ("[The prior art] discloses a 'dispensing top' that has 'a generally conical

shape and an opening at each end,' and 'means at the enlarged end of the top to embrace the open end of the container, the taper of the top being uniform.'"). Rather, Schreiber relied on the functional elements of the claim to establish patentability, arguing that the prior art oil spout patent "does not disclose that such a structure can be used to dispense popcorn from an open-ended popcorn container." *Id.* at 1477; *see also id.* at 1475 (claim providing, for example, that "the opening at the reduced end allows several kernels of popped popcorn to pass through at the same time").

The court explained that "choosing to define an element functionally, i.e., by what it does, carries with it a risk" in that "a functional limitation asserted to be critical for establishing novelty in the claimed subject matter may, in fact, be an inherent characteristic of the prior art." *Id.* at 1478 (quoting *In re Swinehart,* 439 F.2d 210, 212 (CCPA 1971)). To find that a claim element is inherently disclosed in the prior art, it must necessarily be present in the prior art. *King Pharms.*, 616 F.3d at 1274. Because the oil spout in *Schreiber* was "capable of" dispensing popped popcorn in the manner set forth in the claim, it inherently satisfied all of the functional limitations and anticipated the claimed popcorn spout. 128 F.3d at 1478-79. As the court explained, "Schreiber's contention that his structure will be used to dispense popcorn does not have patentable weight if the structure is already known, regardless of whether it has ever been used in any way in connection with popcorn." *Id.* at 1477.

As in *Schreiber*, here all structural limitations recited in the claims are found in the prior art blades. *Id.* at 1477. The only allegedly distinguishing aspect of the claimed rotary blades is that certain surfaces therein are said to "defin[e] first and second bearing faces," i.e., they

are intended to be used to engage the bearing beads within the knife housing. Under *Schreiber*, this distinction is not a patentable one. It is undisputed that the chamfers of the pre-1998 blades could function as bearing faces, as demonstrated by the mock-up used at trial. No recognition of such capability in the prior art is required. *Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) ("[T]his court rejects the contention that inherent anticipation requires recognition in the prior art."); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) ("Inherency is not necessarily coterminous with knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." (quotations omitted)). Each chamfer inherently satisfies the "bearing face" limitation "regardless of whether it has ever been used in any way in connection with [a bearing]." *Schreiber*, 128 F.3d at 1477.

Where all structural elements of a claim exist in a prior art product, and that prior art product is capable of satisfying all functional or intended use limitations, the claimed invention is nothing more than an unpatentable new use for an old product. *Schreiber*, 128 F.3d at 1477.

## III. CONCLUSION

No reasonable jury could conclude that the claims of the '325 patent were novel over the pre-1998 blades because none of the dispositive facts were disputed and the law is clear. I would reverse the district court and enter judgment as a matter of law of anticipation.