*922 REYNA, Circuit Judge,
dissenting.
This patent infringement case involves a substantial question of standing based on an agreement relating to the ownership of the patents-in-suit. In order to achieve certain tax and business benefits, Dow transferred essentially its entire patent portfolio to its holding company pursuant to an agreement entered into in 2002. Dow sued Nova in 2005 for infringement of the patents-in-suit, which were ostensibly transferred to Dow’s holding company under the 2002 agreement. The 2002 agreement and related documents, however, were not produced in litigation by Dow until July 2009, well after discovery had closed. After reviewing the documents, Nova moved to dismiss the case on grounds that Dow lacked standing because it was not the owner of the patents-in-suit when the lawsuit was initiated. The district court opted not to have a hearing on the standing issue until after a jury trial and verdict on the merits of the infringement and invalidity claims. Ultimately, the district court found that the patents-in-suit had never been transferred by Dow to its holding company via the 2002 agreement and, concluding that Dow therefore had standing, entered final judgment on the verdict against Nova.
Because I conclude that the 2002 agreement in fact did transfer the patents-in-suit to Dow’s holding company, and that standing did not exist at the time the complaint was filed, I would reverse the district court and dismiss the case without prejudice. I would not reach the underlying merits of the judgment that the asserted claims of the patents-in-suit were valid and infringed. I respectfully dissent.
I. Background
A. The Agreements Between Dow and DGTI
The Dow Chemical Company (“Dow” or “TDCC”) is the original assignee of U.S. Patent Nos. 5,847,053 and 6,111,023 (the “patents-in-suit”), which are directed to polymer compositions for a stronger form of polyethylene. Dow later established Dow Global Technologies, Inc. (“DGTI”) as a holding company and entered into a Contribution Agreement with DGTI effective January 1, 2002. The recitals of the Contribution Agreement explained that Dow intended to “contribute to DGTI ... all TDCC Patent Rights ... for the licensing thereof by DGTI to TDCC....” A5039. As explained in more detail below, this arrangement afforded certain tax advantages to Dow.
All of Dow’s “Patent Rights” were broadly assigned to DGTI under Section 2.01 of the Contribution Agreement, which provided that “TDCC hereby conveys, transfers, assigns and delivers to DGTI ... all of TDCC’s right and title to and interest in the Patent Rights, Technology and Work Processes, which rights are owned or controlled by TDCC on the Transfer Date.... ” A5041-42 (emphasis added). Central to this appeal is the question of whether the patents-in-suit were among the transferred “Patent Rights,” which were defined in Section 1.07 as follows:
“Patent Rights” means any and all patents and applications for patents of any kind, filed with or granted by a governmental body of the United States or any other country ... which are owned solely or controlled by TDCC on the Transfer Date or thereafter ... that TDCC is able to assign to DGTI without the consent of or accounting to a Third Party or Affiliated Company, without diminishing the royalties paid or payable by or otherwise materially affecting the obligations of such Third Party or Affiliated Company with respect to such Patent Rights, and without resulting in a loss of *923 rights. The parties shall provide a schedule of Patent Rights as Schedule A to this Agreement, within ninety (90) days of the Effective Date, and shall provide subsequent supplements thereto from time to time during the Term.
A5040. This definition and the parties’ understanding of its meaning are critical to the resolution of this case.
A Schedule A of Patent Rights was not prepared within 90 days of the Effective Date, as was contemplated under Section 1.07. However, the Contribution Agreement did not make the transfer of Patent Rights contingent on the creation or ultimate content of Schedule A. The substantive language of the agreement — not the schedules — was intended to be controlling as to the rights and obligations of the parties. In particular, Section 9.07 provided that while schedules were incorporated by reference into the agreement, the inclusion or omission of an item from a schedule “shall not give rise to rights or an implication that DGTI has rights greater than those expressly provided for in this Agreement” or “give rise to an implication that DGTI has rights less than those otherwise provided for in this Agreement,” respectively. A5046. Thus, the Contribution Agreement overall provided that upon execution DGTI was to receive all of Dow’s “Patent Rights” as generally defined above, regardless of whether Schedule A existed or what might have been listed on it.
In accordance with the stated purpose of the Contribution Agreement, Dow and DGTI simultaneously entered into a Patent and Technology License Agreement (“PTLA”), whereby DGTI licensed back to Dow patent rights transferred under the Contribution Agreement on a non-exclusive, royalty-bearing basis. The PTLA provided mechanisms for Dow to seek enforcement of Licensed Patent Rights through DGTI’s reassignment of any transferred patents to Dow, or by DGTI permitting Dow to file suit in DGTI’s name. At Dow’s request, DGTI was required to promptly assign patents to Dow “in a manner that avoids loss of rights.” A5590.
An overall objective of this ownership and licensing scheme established between Dow and DGTI was for Dow to realize certain tax benefits. For the scheme to work, the holding company DGTI was required to be the owner of the Patent Rights, and to then license the patents back to Dow in exchange for royalty payments. Indeed, between 2005 and the third quarter of 2009, approximately $68 million in royalties were paid by Dow to DGTI for its “ELITE” family of products, which are covered by the '023 patent. For these payments, DOW does not contest that it obtained a two percent (after federal tax) state tax savings. Dow contends that these royalty payments were for “Technology” and “Work Processes” such as trade secrets transferred by the Contribution Agreement and licensed under the PTLA, not the '023 patent. No documentary evidence in the record apportions out the royalty payments, and witnesses testified that they had “no basis to know” and were “not sure” to what extent the royalty payments were attributable to licensed patent rights as opposed to other intellectual property. A7106, A7140.
While the royalties recited in the PTLA are expressed in terms of “Technology” and “Work Processes,” neither of which is defined to expressly include “Patent Rights,” the PTLA makes clear that Dow was to pay those royalties “[i]n consideration of the licenses ... granted [to Dow],” which include a license to use the Licensed Patent Rights. A5582-83. Indeed, one of the PTLA’s preambles refers to Dow obtaining a “royalty-bearing non-exclusive li *924 cense to the Intangible Assets owned by DGTI,” and “Intangible Assets” are defined as including the “Patent Rights” transferred to DGTI under the Contribution Agreement. A5576, A5578. Moreover, “Patent Rights” are clearly related to “Technology” under the PTLA, since “Licensed Patent Rights” are defined as “that portion of Patent Rights that are relevant to the manufacture, sale and direct or indirect use of Licensed Products [i.e., products manufactured with Licensed Technology ] ... or to the utilization of Licensed Processes [i.e., methods and techniques for manufacturing products with Licensed Technology ]....” A5579 (emphasis added). Royalties were thus paid by Dow to DGTI at least in part for the grant-back licenses to the Patent Rights under the PTLA.
B. Litigation and Discovery Conduct By Dow
Dow filed its patent infringement complaint against NOVA Chemicals Corporation and NOVA Chemicals Inc. (collectively, “NOVA”) on October 21, 2005. It was not until June 19, 2009, five months after discovery closed, that Dow produced the Contribution Agreement in response to NOVA’s outstanding requests for production. The Contribution Agreement was accompanied by a document entitled “Schedule A-Patent Rights,” which contained no listing of patents, but was a single sheet stating that “this Schedule includes all Patent Rights of [Dow] ... excluding Excluded Patent Rights set forth in Schedule ‘D.’ ” A5520. Also produced was a document entitled “Schedule D: Excluded Patents,” which did contain a listing of patents and included the patents-in-suit. A5521-74. This Schedule D had been updated by Dow to add the patents-in-suit to it right before it was produced. A7147. Lastly, Dow produced a Quitclaim Deed dated June 15, 2009 — four days prior to production and more than three and a half years after the lawsuit was filed— which assigned to Dow “all of DGTI’s right, title, and interest to the Patents[-in-suit], if any.” A5092-93. The Quitclaim Deed was purportedly intended “to remove any potential doubt as to ownership of the patents[-in-suit].” Id.
While it is clear that Nova’s discovery requests spurred Dow to update the Schedule D and execute the Quitclaim Deed, the record does not explain why Dow waited so long to produce the previously existing documents. The record also does not reflect the nature and extent of Dow’s pre-filing investigation with respect to standing, which presumably would have revealed those existing documents four years prior, in 2005, when the lawsuit was filed.
After receiving and reviewing the Contribution Agreement, Schedules A and D, and the Quitclaim Deed, Nova pressed Dow for additional related documents bearing on standing. Dow then produced the original Schedule D from 2002 which, unlike the previously produced and recently updated Schedule D, did not list the patents-in-suit as “Excluded Patents.” Dow also produced the December 15, 2005 version of a document labeled “Schedule B Supplement,” which Dow’s paralegal testified was intended to be Schedule A to the Contribution Agreement. Unlike the previously produced Schedule A of Patent Rights, the Schedule B Supplement comprised a listing of patents, but it did not include the patents-in-suit. Dow’s paralegal testified that she did not know what modifications were made to the Schedule B Supplement as it existed prior to the December 15, 2005 version that was produced. Testimony also suggested that the Schedule B Supplement was a print-out of a query to an internal patent database for DGTI patents, which database was not *925 updated to reflect the transfer of patents under the Contribution Agreement.
Based on these documents, NOVA believed that Dow transferred the patents-in-suit to DGTI in 2002 and did not own them when the lawsuit was filed. Nova moved to dismiss for lack of standing or, in the alternative, for full standing discovery. Nova’s motion was pending and languished for nine months, at which time the district court finally denied NOVA’s request that standing be addressed before the infringement trial. The district court did, however, allow limited standing discovery including abbreviated depositions of Dow’s witnesses.
With the threshold standing issue still unresolved, the infringement trial proceeded. The jury found the patents-in-suit to be infringed and not invalid, and awarded Dow damages of $61.8 million. The district judge held a bench trial on standing the following day and ultimately denied NOVA’s motion to dismiss for lack of standing and entered judgment in favor of Dow. Dow Chem. Co. v. Nova Chems. Corp., 726 F.Supp.2d 459, 463-64 (D.Del.2010) (“Standing Op.”).
The district court found the Contribution Agreement to be clear on its face and held that “a transfer of the patents-in-suit is not effectuated unless and until the patents are explicitly listed on Schedule A.” Id. at 462-68. The district court considered testimony from Dow’s witnesses and found that the Schedule B Supplement produced by Dow was “in fact, intended to be Schedule A and used by the parties as Schedule A.” Id. at 463-64. Because the Schedule B Supplement did not list the patents-in-suit, in the district court’s judgment the patents-in-suit were not transferred to DGTI under the Contribution Agreement, and Dow had standing to bring and maintain the lawsuit. Id.
II. DISCUSSION
Standing is a threshold jurisdictional question which we review de novo. Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1367 (Fed.Cir.2008). The proper interpretation of a contract is a question of law that is also reviewed de novo. First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed.Cir.2011). Dow has the burden of proving standing to sue, and must demonstrate by a preponderance of the evidence that it held enforceable title on the date the complaint was filed. Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc., 587 F.3d 1375, 1378 (Fed.Cir.2009); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (U.S.1992).[1] The threshold issue of standing must be satisfied in all eases, as it is “an essential and unchanging part of the case-or-controversy requirement of Article III.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130.
The Contribution Agreement indicates that its interpretation “shall be governed by and construed in accordance with the laws of the state of Delaware, without regard to principles of conflicts of laws,” and so Delaware’s principles of contract interpretation are to be applied in this case. A5046; Parental Guide of Tex., Inc. v. Thomson, Inc., 446 F.3d 1265, 1269 (Fed.Cir.2006) (“Contract interpretation is a matter of state law.”). As explained by the Supreme Court of Delaware,
*926 In analyzing disputes over the content of a contract, we give priority to the intention of the parties. We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning. We will also construe the agreement as a whole, giving effect to all provisions therein, conscious of the fact that the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement’s overall scheme or plan. Keeping these rules in mind, we should look to harmonize the entire agreement and remain consistent with the objective intent of the parties that drafted the contract.
Land-Lock, LLC v. Paradise Prop., LLC, 963 A.2d 139 (Del.2008) (Table) (citations and quotations omitted). Thus, Delaware courts are required to read a contract as a whole and to give effect to each provision thereof in order not to render any part of the contract “meaningless or illusory.” Estate of Osborn v. Kemp, 991 A.2d 1153, 1159 (Del.2010).
While parties are generally bound by the plain meaning of the contractual language, such language is properly deemed ambiguous “when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.” AT&T Corp., v. Lillis, 953 A.2d 241, 252-53 (Del.2008). If a Delaware court finds that a disputed contract term is ambiguous, then the “consideration of extrinsic evidence is required ” to determine the intended meaning of the parties. Id. at 253 (quoting Appriva Shareholder Litig. Co., LLC v. EV3, Inc., 937 A.2d 1275, 1291 (Del.2007)) (emphasis added); see also Eagle Industries, Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del.1997) (“When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties’ intentions.”) (emphasis added).
Looking to the intention of the parties as reflected by the four corners of the Contribution Agreement, it is clear that the Contribution Agreement was intended to effectuate a broad mass transfer of patents from Dow to DGTI so that DGTI could grant back a license to Dow. Only certain patents subject to three specified exceptions under Section 1.07 of the Contribution Agreement were not subject to the transfer. The first two exceptions, which are not at issue in this case, encompassed patents that cannot be transferred without affecting the rights or obligations of Dow, its Affiliated Companies, or third parties under prior agreements or assignments relating to Dow’s patents. The third exception, which is disputed and central to this appeal as discussed below, encompassed patents for which transfer “would result in a loss of rights.”
The threshold jurisdictional issue before us is whether the patents-in-suit were excluded from transfer under the Contribution Agreement. Resolution of this issue centers around the proper interpretation of Section 1.07, which requires a careful analysis of the purpose of Schedule A, the meaning of the “loss of rights” provision in the definition of Patent Rights, and other extrinsic evidence offered to show the parties’ intent. Guided by the above principles of Delaware contract law, I address each of these matters in turn.
A. The Purpose of Schedule A
The district court erred in finding that Schedule A was the legally operative docu *927 ment that effectuated all transfers of patents under the Contribution Agreement. The operative transfer language is provided in Section 2.01. A5041-42 (“TDCC hereby conveys, transfers, assigns and delivers to DGTI ... all of TDCC’s right and title to and interest in the Patent Rights.... ”). Section 1.07 defines the transferred Patent Rights as “any and all patents” owned by Dow that Dow can assign without implicating one of three exceptions, none of which reference Schedule A. Nowhere in the Contribution Agreement is the transfer predicated or dependent upon whether patents are listed on Schedule A. Indeed, Section 9.07 makes clear that the contents of the schedules are not controlling. Moreover, Section 2.01 provides that Dow “hereby” transfers the patents, which strongly indicates an immediately effective transfer, while Schedule A was not even required to be completed until after the Contribution Agreement was executed. See Abraxis, 625 F.3d at 1364-65 (distinguishing a party who “hereby assigns” rights from one that merely “agrees to assign” such rights in the future); DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed.Cir.2008) (contrasting a present assignment of rights to future inventions, which causes transfer by operation of law when a future invention comes into being, with a promise or obligation to assign those same rights in the future).
To find that no patents were transferred unless and until listed on the Schedule A ignores Section 9.07, nullifies the transfer set forth in Section 2.01, renders superfluous the detailed and specific definition of Patent Rights in Section 1.07, and rearranges the fundamental purpose of the tax and business scheme intended under the agreement as a whole. Such a reading would cause most of the Contribution Agreement to be “meaningless or illusory.” Osborn, 991 A.2d at 1159. The reference to Schedule A in the Contribution Agreement shows that the parties desired to make and maintain a listing of the patents that were transferred to DGTI as a matter of convenience, not as a prerequisite to a valid transfer.
The majority takes great effort in arguing that Schedule A necessarily dictates the operation of the agreement. Because Section 9.07 acknowledges that “inadvertent errors” may occur in the preparation of the schedules and provides that that these errors should be corrected by the parties, the majority believes that Schedule A is intended to be controlling unless the parties mutually agree that a mistake or omission has been made in its preparation. A5046. This view turns the Contribution Agreement on its head by eviscerating Section 1.07’s definition and inflating the role of Schedule A without any basis in the Contribution Agreement or Delaware law. Under Section 9.07, any erroneously included or omitted items from the schedules “shall not give rise to rights or an implication that DGTI has rights greater than those expressly provided for in this Agreement” or “give rise to an implication that DGTI has rights less than those otherwise provided for in this Agreement,” respectively. A5046. Section 9.07 is thus better understood as a provision whereby the parties expected that Schedule A would accurately reflect the transferred Patent Rights, and to the extent Schedule A did not accord with the definition of Patent Rights in Section 1.07 — i.e., it included “inadvertent errors” — Section 1.07 would control and Schedule A would be appropriately updated.
While the majority focuses on whether Schedule A is “meaningful,” the real issue before us is whether Schedule A alone dictates which patents were transferred from Dow to DGTI. The language of Sections 1.07, 2.01, and 9.07, when read to *928 gether to give effect to the intended scheme of the Contribution Agreement, makes clear that it does not.
B. The Meaning of “Loss of Rights”
Dow argues in the alternative that the patents-in-suit did not fall within the definition of Patent Rights that Dow transferred to DGTI. As noted above, in Section 1.07 there were three circumstances which excepted a patent from being transferred: (1) the transfer would require “the consent of or accounting to a Third Party or Affiliated Company”; (2) the transfer would “diminish[ ] the royalties paid or payable by or otherwise materially affecting the obligations of such Third Party or Affiliated Company with respect to such Patent Rights”; or (3) the transfer would result in “a loss of rights.” A5040. Dow does not contend that the transfer of the patents-in-suit would be precluded under the two former exceptions. Rather, Dow claims that the patents-in-suit were not transferred because such a transfer would have resulted in a “loss of rights” to Dow, namely, Dow’s ability to recover lost profits from NOVA by not owning the patents during the period of NOVA’s alleged infringement. Dow’s position would therefore preclude transfer of any and all enforceable patents covering technology that Dow was then using or might have begun using in the future.
Unlike Dow, the majority declines to address the meaning of the “loss of rights” clause at all. The majority believes that in the context of Section 1.07, Schedule A is a “quite specific” provision, whereas the phrase “loss of rights” is “part of a broad exclusionary definition,” such that Schedule A must trump and substitute for the general definition because the “specific and general provisions conflict.” Maj. Op. at 914 (citing DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del.2005) (“Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.”)). To reach this conclusion, the majority finds a false conflict between the qualitative definition of Patent Rights in Section 1.07 and the reference to Schedule A. As discussed above, the “loss of rights” clause describes one category of patents that are excluded from transfer, and Schedule A is merely a document intended to accurately list the transferred Patent Rights. Schedule A’s “quite specific” listing and Section 1.07’s “broad exclusionary definition” co-exist without conflict because the definition governs the transfer in the event of any inconsistency between the definition and Schedule A.
Again, it is impermissible for the majority to treat the entire definition of Patent Rights as superfluous, and thereby decline to interpret its language. Osborn, 991 A.2d at 1159. The effect of the “loss of rights” clause in particular is a critical disputed issue in this case that begs the question as to its meaning. In order to “read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument,” the “loss of rights” clause must be interpreted, for it is a key component of the agreement. Elliott Assocs. v. Avatex Corp., 715 A.2d 843, 854 (Del.1998).
The phrase “loss of rights” is not defined in the Contribution Agreement, nor it is used anywhere other than in Section 1.07. Nevertheless, it is clear that this “loss of rights” language cannot mean what it says on its face because no patent can be transferred without a loss of some rights by the transferor. Contrary to Dow’s assertions, there is nothing in the agreement suggesting that the “loss of rights” clause contemplated the right to recover lost profits in litigation. In contrast with the rights relating to the pay *929 able royalties expressly mentioned in Section 1.07, lost profits are not mentioned in the Contribution Agreement, nor is the word “litigation” used. The context in which the loss of rights clause appears— 1.e., being listed third in a sentence after two other exceptions involving third party rights and obligations under the patents, including those relating to royalties — is unhelpful because “loss of rights” is in no way tied to the other exceptions. The overall objective of the Contribution Agreement to transfer patents to DGTI for licensing back to Dow does not assist us in deciding to what extent the clause implicates litigation standing or substantive remedial rights. Even the majority agrees that the parties’ best attempts to give meaning to the “loss of rights” phrase have no discernible basis in the four corners of the agreement. Maj. Op. at 914 (“Neither one of [the parties’] theories is anchored in the text of the Contribution Agreement.”). As such, the phrase “loss of rights” is ambiguous as used in the Contribution Agreement and Delaware law requires examination of the extrinsic evidence to resolve the ambiguity. AT&T Corp., 953 A.2d at 253. While the district court and the majority both erroneously fail to undertake this analysis, I will now address the pertinent extrinsic evidence bearing on the meaning of “loss of rights.”[2]
1. Contemporaneous Communications
Under Delaware law, outside the express terms of an agreement, communications and documentation made contemporaneously with the agreement are the best extrinsic evidence of the parties’ intent. See Hudak v. Procek, 806 A.2d 140, 148 (Del.2002) (explaining that absent contemporaneous documentation, parties may generally offer two types of evidence to prove intent: testimony concerning their intent or post-transaction conduct). This case presents an instance in which there are documents in the record that were contemporaneously prepared by the parties to the Contribution Agreement, and which explicitly discuss their reasoning for including the disputed “loss of rights” term. Importantly, these discussions address the effect the transfer of Patent Rights would have on Dow’s standing to assert patents in litigation.
On January 27, 2002, shortly before the Contribution Agreement was signed,[3] Dow’s Managing Patent Counsel Mr. Bruce Kanuch sent an email posing the *930 following question about the Contribution Agreement’s effect on Dow’s then-pending litigations:
Did transfer of all patents into this new company have any provisions on how to handle pending litigations under Dow patents.... It is a question of who had standing and who is the real party in interest in these litigations.
A5664 (emphasis added). Other in-house counsel explained that standing for future potential litigations, such as in this case, could be easily addressed by the PTLA’s provisions for re-assignment of patents to Dow, but that pending litigations were not specifically addressed by the Contribution Agreement:
The Patent and Technology License Agreement, which also will be executed shortly, makes provision for DGTI to convey rights to bring suit under patents even after these are contributed, but no specific mention was made of the current litigations.
A5663. Mr. Kanuch then elaborated on his standing concerns, observing that while licensing arrangements can in some circumstances impart licensees with standing, it was generally easier to just sue in the name of the owner/licensor. He therefore proposed that it would be best for patents involved in pending litigation to remain with Dow and not be transferred to DGTI:
The issue is primarily one of legal standing to bring and/or maintain the lawsuit. Normally an exclusive license must include an essentially complete transfer of all rights under the patent in order for the licensee to have standing to bring the suit in its own name without adding the patent owner. If not the court’s fear is that the patent owner could later bring a second suit. It would be cleaner to have title stay with TDCC or transfer the patent and bring suit in the name of Dow Tech, Inc. For the suits that are already pending it would make it simpler to have the patents just remain with Dow.
Id. (emphasis added). Dow’s in-house counsel agreed with Mr. Kanuch’s proposal and explained that she added a “loss of rights” provision to address his concern:
Thank you for the feedback. I’ve addressed this issue in the contribution agreement by excluding patents that can’t be transferred to DGTI without a loss of rights (previously, it excluded patents that can’t be transferred to DGTI without a loss of patent protection). As an overall safety net, there is a schedule of excluded intangible assets, just in case there may be other instances in which we determine that there would be some disadvantage in transferring the assets to DGTI.
Id. (emphasis added). In an abundance of caution, other in-house counsel responded with a proposal to schedule the patents that were involved in pending lawsuits:
It is desirable to avoid any ambiguity with regard to TDCC’s rights to continue the suits. 7 recommend that we schedule the patents involved in these litigations to affirm these are not contributed to [Dow Global] for the duration of the litigation.
A5662 (emphasis added). Finally, Dow’s paralegal responded with an email attaching “a listing of Dow’s patents involved in litigation on Jan. 1, 2002.” A5662.
These emails show that Dow and DGTI were concerned with losing standing in pending litigations by transferring the asserted patents to DGTI in the middle of the case. The solution to the problem in their minds was the loss of rights clause, which operated to preclude transfer of patents involved in pending cases that had been brought in Dow’s name only. To remove any doubt, they even scheduled a *931 list of patents involved in litigations pending on January 1, 2002, which were supposedly not to be transferred. Future cases were not perceived as problematic from a standing perspective since such cases could simply be brought by DGTI or, upon Dow’s request, DGTI could transfer patents back to Dow. In any event, the focus of these contemporaneous communications concerning the loss of rights provision was solely on the issue of legal standing. Notably absent from these emails is any mention of lost profits, which is reasonable since the right to collect lost profits has no bearing on Dow’s ability to “bring and/or maintain ... lawsuitfs].” A5663.
These contemporaneous communications show that “loss of rights” in Section 1.07 was meant to address the loss of ownership rights that would eliminate Dow’s standing in any litigations pending as of January 1, 2002. Since the patents-in-suit were not asserted against NOVA until 2005, they were not excepted from transfer under the “loss of rights” clause, and as such were transferred to DGTI under the Contribution Agreement.
C. Other Extrinsic Evidence
Other extrinsic evidence offered by the parties regarding transfer and/or the meaning of the “loss of rights” clause comprises Dow’s and DGTI’s post-execution conduct, primarily with respect to the contents of Schedules A and D. In brief, I find this additional evidence is not persuasive to overcome the express language of the agreements or the clear evidence as to the meaning of “loss of rights.”
1. The Schedule B Supplement
First, the parties argue whether the presence or absence of the patents-in-suit on Schedule A to the Contribution Agreement reflect an intention of Dow and DGTI to exclude the patents-in-suit from transfer under the loss of rights clause. While I conclude that the district court did not clearly err in finding that Dow’s Schedule B Supplement was in fact intended to be Schedule A, and that this version of Schedule A did not list the patents-in-suit, as discussed above, Schedule A does not control what was or was not transferred. Whether the patents-in-suit were listed on Schedule A also has little to no bearing on what the operative language “loss of rights” means.
To the extent the Schedule B Supplement lists what Dow and DGTI thought was transferred to DGTI under the Contribution Agreement, I note that no version of Schedule A in the record was prepared contemporaneously with the Contribution Agreement. The only version of Schedule A before us that listed any patents was dated December 15, 2005, far removed from the effective date of the Contribution Agreement (January 1, 2002) and therefore of very limited probative value regarding the parties’ intent in 2002. Moreover, because this Schedule A was dated nearly a month after the complaint was filed (October 21, 2005), and because Dow did not introduce evidence or testimony to show what changes were made to the document pri- or to December 15, 2005, there is no basis — much less a preponderance of the evidence — to conclude that the patents-in-suit were not listed on Schedule A when the lawsuit was initiated. Lastly, Dow contends that since the Schedule A in the record lists only four of Dow’s approximately 7,300 pre-2002 United States patents, U.S. patents in addition to those involved in pending litigation were excluded from transfer. Yet there is no evidence in the record that explains why those four U.S. patents in particular were the only ones listed. It strains credibility to *932 suggest that only four U.S. patents were transferred by an agreement having such broad transferring language, particularly given the substantial anticipated tax benefits that would accrue from a mass transfer of U.S. patents under Dow’s overall assignment and grant-back scheme.
The majority finds no basis to doubt the accuracy of the October 21, 2005 Schedule A in terms of reflecting ownership of the patents-in-suit when this lawsuit was filed. Despite finding the Contribution Agreement unambiguous and requiring no inquiry into extrinsic evidence, the majority selectively points to the extrinsic testimony of Dow’s paralegal Kathleen Maxwell to suggest that no version of Schedule A ever listed the patents-in-suit so as to effectuate their transfer to DGTI. The majority points out that Schedule A was originally created in 2002 by Ms. Maxwell from Dow’s internal database listing of patents owned by DGTI. However, this proves nothing as to the effect of the Contribution Agreement on Dow’s patent portfolio ownership because Ms. Maxwell, who testified that she was responsible for managing the database, also testified that she had not updated the database in 2002 to reflect the Contribution Agreement. Likewise, Ms. Maxwell’s testimony does not explain which patents were added or removed from the database over time, or why such changes were made, in relation to subsequent updates to Schedule A leading up to the December 15, 2005 version in evidence. Ms. Maxwell’s only means of verifying that the patents-in-suit were not listed on Schedule A currently was to query Dow’s new internal database which the evidence shows was only in use since 2009, long after the Contribution Agreement’s execution and the filing of the present lawsuit. Regardless of the “virtually unassailable” credibility of Ms. Maxwell with respect to the statements cited by the majority, those statements tell only part of the story and were controverted by other testimony. This weak and inconclusive testimony as to the contents of Schedule A over time, particularly in light of the absence of any documentary evidence as to Dow’s internal database or Schedule A prior to October 21, 2005, calls into question which patents, if any, were listed on any version of Schedule A that existed prior to the filing of this lawsuit.
The Schedule A in the record simply does not help Dow carry its burden to prove by a preponderance of the evidence that the patents-in-suit were owned by Dow when it initiated this lawsuit, nor does it provide any guidance as to what was meant by “loss of rights” in 2002.
2. Schedule D
Second, the parties argue whether Schedule D to the Contribution Agreement, which provides a listing of “Excluded Intangible Assets,” indicates that the patents-in-suit were transferred. Schedule D was prepared by Dow and DGTI within the 90 day period specified under the Contribution Agreement and, unlike the Schedule B Supplement, was therefore contemporaneously created with the Contribution Agreement. Delaware law treats such contemporaneous documentation as more probative of intent than later-created evidence or testimony. See Hudak, 806 A.2d at 148 (emphasizing that evidence “at the time of the transaction” is most probative of the contemporaneous understanding of an agreement). The contemporaneously prepared Schedule D did not list the patents-in-suit, but a later version of Schedule D updated by Dow in 2009 in response to Nova’s discovery requests did list the patents-in-suit. NOVA argues that the absence of the patents-in-suit on the original Schedule D indicates that the patents-in-suit were in fact transferred. NOVA also *933 contends that the later updated version of Schedule D which included the patents-in-suit was essentially a litigation-induced fabrication to make it appear as if the patents-in-suit had not been transferred in 2002.
While Dow’s counsel understood Schedule D as “an overall safety net” useful to avoid disadvantageous transfers, A5663, the Contribution Agreement is not clear as to how Schedule D relates to the definition of Patent Rights in Section 1.07, if at all. Neither Schedule D nor the “Excluded Intangible Assets” are referenced anywhere in connection with the transferred Patent Rights. To the extent Schedule D was intended to list patents that were not transferred, the version of Schedule D prepared contemporaneously with the Contribution Agreement did not list the patents-in-suit, and this fact should not be disregarded. See Hudak, 806 A.2d at 148.
Even if the presence of a patent on Schedule D excluded it from transfer for some reason, the inverse is not necessarily true. Because the schedules to the Contribution Agreement are not controlling, a patent not listed on Schedule D could still be excluded from transfer under one or more of the exceptions in Section 1.07. Thus, Schedule D alone cannot reveal why any given patents were listed as Excluded Intangible Assets, and the absence of the patents-in-suit from the original Schedule D could have been for any number of reasons. To the extent Dow argues that there are generally more U.S. patents listed on Schedule D than were involved in active litigation in 2002 — which could arguably support its “lost profits” theory — I see no evidence in the record to support this statement or explain why the particular U.S. patents listed on Schedule D were excluded from transfer, and I see no need to engage in further analysis of this assertion. See Gemtron Corp. v. Saint-Gobain Corp., 572 F.3d 1371, 1380 (Fed.Cir.2009) (emphasizing that “unsworn attorney argument ... is not evidence”). I therefore find the parties’ arguments regarding Schedule D to be unpersuasive, and unhelpful in discerning what “loss of rights” means.
3. USPTO Assignment Records and Maintenance Fees
Third, the parties point to other purportedly objective indications of ownership of the patents-in-suit. For example, Dow notes that Dow and DGTI filed assignment documents with the U.S. Patent and Trademark Office (“USPTO”) to record the transfer of ownership for many patents to DGTI, but did not do so for the patents-in-suit. NOVA counters that DGTI, not Dow, bore the cost of the maintenance fees paid to the USPTO for the patents-in-suit from 2004 to the present. Dow’s chief IP counsel conceded that typically it is the owner of a patent who pays the maintenance fees. Despite that this conflicting post-execution conduct is at best ambiguous as to whether the patents-in-suit were conveyed by Dow to DGTI, the majority finds the 1990s assignment records at the USPTO persuasive to suggest that Dow is in fact the proper owner of the patents-in-suit. The assignment records merely create a presumption of ownership, however, and are not dispositive. See SiRF Tech., Inc. v. Int’l Trade Comm’n, 601 F.3d 1319, 1327-28 (Fed.Cir.2010). In this case, subsequent to the USPTO assignment records are the Contribution Agreement and the Quitclaim Deed showing Dow’s transfer and reacquisition of the patents-in-suit. Rather than relying on an absence of a future recorded assignment to show that Dow still owns the patents-in-suit, as the majority does, I find the evidence in the record of actual subsequent assignment documents more persuasive to show which *934 entity held title to the patents-in-suit when this litigation commenced.
4. Patent Royalty Payments
Lastly, NOVA contends that Dow’s royalty payments to DGTI and corresponding tax benefits indicate that Dow transferred the patents to DGTI. Otherwise, according NOVA, Dow has taken a position so as to have its cake and eat it too — to own the patents for purposes of standing but not for purposes of royalties and taxation. While the record is not clear as to how much of the royalty payments are attributable of the '023 patent, Dow has not shown that the payments were made solely in exchange for rights to intellectual property other than the patents-in-suit. Dow concedes that it received tax benefits, and the PTLA as a whole strongly suggests that the royalties owed to DGTI relate at least in part to the '023 patent (i.e., to Dow’s ELITE product line), but Dow presented no evidence to apportion out the royalty payments that gave rise to its tax benefits. Only Dow would have this information. This failure of proof by Dow tends to suggest that the '023 patent was transferred to DGTI. Again, Dow bears the burden to establish standing, and this glaring contradiction between the overarching goal of the agreements and Dow’s assertion that the patents-in-suit were somehow not part of the transfer and grant-back scheme highlights Dow’s failure to carry its burden. Land-Lock, 963 A.2d 139 (explaining that contracts should not interpreted by making “inference[s] run[ning] counter to the agreement’s overall scheme or plan”).
In sum, I find that the Contribution Agreement, when read in light of all the extrinsic evidence, shows that the patents-in-suit were transferred to DGTI as of January 1, 2002.
III. Dismissal With Prejudice Is Unwarranted
The law “universally disfavors dismissing an action with prejudice based on lack of standing,” and I see no compelling reason to so do as a sanction in this case. Univ. of Pittsburgh v. Varian Med. Sys., Inc., 569 F.3d 1328, 1332-33 (Fed.Cir.2009). Dismissal without prejudice tends to be appropriate where, as here, the plaintiff is able to cure (and indeed already has cured via the Quitclaim Deed) the standing problem. See Tyco, 587 F.3d at 1380 (affirming dismissal without prejudice in part because “[a]s best we can tell, Tyco Healthcare may become able to show that it owned the asserted patents. Alternatively, Tyco Healthcare may be able to obtain ownership of the patents.”); Sicom Sys. v. Agilent Techs., Inc., 427 F.3d 971, 980 (Fed.Cir.2005) (affirming dismissal with prejudice where plaintiff “already had a chance to cure the [standing] defect and failed”); Fieldturf, Inc. v. Southwest Rec. Indus., 357 F.3d 1266, 1269 (Fed.Cir.2004) (“On occasion, ... a dismissal with prejudice is appropriate, especially where ‘it [is] plainly unlikely that the plaintiff [will be] able to cure the standing problem.’ ”) (citations omitted).
NOVA argues that Dow failed to perform a sufficient pre-filing investigation, failed to provide timely and adequate discovery on standing issues, and produced schedules of questionable authenticity and accuracy, all of which “wasted untold time and money on an infringement case that should never have been brought or should promptly have been dismissed.” NOVA Br. at 56. Essentially, NOVA argues that Dow has engaged in the kind of conduct that warrants a dismissal with prejudice as a sanction. In support of its argument, NOVA cites Lans v. Digital Equip. Corp., in which this court affirmed a district *935 court’s dismissal with prejudice where the plaintiff “purported to own a patent he did not actually own ... did not disclose the actual owner until the [Defendants] discovered the assignment ..., and even then he equivocated.” 252 F.3d 1320, 1328-29 (Fed.Cir.2001). The plaintiff in Lans, however, could not re-file because the patent had expired and he could not recover past damages under 35 U.S.C. § 287. Id. at 1328. Moreover, there was no dispute that the plaintiff in Lans had actually assigned away the patent to another entity before misrepresenting that he still owned the patent. Rather, the plaintiff alleged that he “had simply forgotten about the assignment,” but the district court found this allegation of an honest mistake was not credible. Id. at 1324-25. While dismissal with prejudice was appropriate in that case, this court has been appropriately reluctant to sanction parties with a dismissal with prejudice. See Univ. of Pittsburgh, 569 F.3d at 1333-34 (reversing dismissal with prejudice despite district court’s specific findings of “untimely and unfair” conduct in choosing not to join a necessary party for “tactical” reasons, as well as “undue delay” via failure to abide by scheduling orders). I would decline to impose such a harsh penalty on Dow based on the record before us in this case.
IV. Conclusion
I believe that law schools still teach first year law students that whether standing exists should always be one of the first questions considered when a lawsuit is likely to be filed. When a genuine question of standing is presented, its resolution should not be delayed by the parties or by the court, as every day spent in a litigation brought without standing is wasteful. Counsel, as fiduciaries to their clients and officers of the court, are obligated to diligently work to prevent such unnecessary burdens on the justice system.

. While Dow received a Quitclaim Deed to the patents-in-suit from DGTI effective June 15, 2009, such a nunc pro tunc assignment cannot confer standing retroactively. Abraxis Bioscience, Inc. v. Navinta, LLC, 625 F.3d 1359, 1366-67 (Fed.Cir.2010) ("Abraxis was required to have legal title to the patents on the day it filed the complaint and that requirement can not be met retroactively.’’).

. Under these circumstances, whereby in our de novo review I would reverse the district court and find ambiguity, this court has the authority to fully delve into the extrinsic evidence to resolve the ambiguity, rather than remand to the district court for further fact finding. See Metric Constructors, Inc. v. NASA, 169 F.3d 747, 749, 753-54 (Fed.Cir.1999) (reversing Board decision where evidence of trade practice, custom, and the parties’ conduct was given "no weight ‘in light of the clear words' of the contract,” and resolving the ambiguity without remand).
Because the district court found the Contribution Agreement to be unambiguous, it did not engage in a thorough discussion of the extrinsic evidence. Nevertheless, while the district court made clear that it did consider such evidence, it determined that it ultimately was "not persuaded” that the extrinsic evidence should change the result. Standing Op. at 461, 463. Despite also deeming the Contribution Agreement unambiguous, the majority analyzes extrinsic evidence alleged to support its conclusion, such as testimony from Dow's paralegal Kathleen Maxwell on the issue of the accuracy and authenticity of the Schedule B Supplement in evidence. These internally contradictory approaches of the district court and the majority belie their findings that there is no ambiguity concerning the Contribution Agreement and Schedule A.